IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| SHEILA CULWELL, | § | |
|     PLAINTIFF, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:07-CV-596-A |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL SECURITY | § | |
|     DEFENDANT. | § | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER**

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.   STATEMENT OF THE CASE

Plaintiff Sheila Culwell brings this action pursuant to Sections 405(g) and 1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the Commissioner of the Social Security Administration denying her claim for supplemental security income or SSI benefits under Title XVI of the Social Security Act. Culwell applied for SSI benefits on May 3, 2004, alleging disability commencing August 1, 2002. (Tr. 48, 83). She subsequently amended her onset date to May 3, 2004. (Tr. 471). The Social Security Administration denied Culwell's application for benefits both initially and on reconsideration, and Culwell requested a hearing before an

administrative law judge (the "ALJ").  ALJ Jack W. Raines held a hearing on June 6, 2006 in Fort Worth, Texas. (Tr. 468).  Culwell was represented by counsel. On January 25, 2007, the ALJ issued a decision that Culwell was not disabled and thus was not eligible for SSI benefits.  (Tr. 12-19). The Appeals Council denied Culwell's request for review, leaving the ALJ's decision to stand as the final decision of the Commissioner.  (Tr. 5).

B.      STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). The regulations outline a five-step sequential evaluation process for claims of disability. 20 C.F.R. § 416.920. First, the claimant must not be presently working at a level of substantial gainful activity. Substantial gainful activity is work involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. § 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. An impairment or combination of impairments is severe if it has such minimal effect that it would not be expected to interfere with the individual's ability to work. 20 C.F.R. § 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000).  At the third step, disability will be found if the claimant's impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. *Id.* § 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* § 416.920(e). And fifth, the impairment must prevent the

claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* § 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198. If the Commissioner meets this burden, the claimant must then prove he in fact cannot perform the alternate work. *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Hollis*, 837 F.2d at 1383.

C.   ISSUE

Whether the ALJ's assessment of Culwell's residual functional capacity is supported by substantial evidence and consistent with relevant law.

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 3**

D.      ADMINISTRATIVE RECORD

    1.      Medical History[1]

On August 6, 2004, Culwell underwent a consultative evaluation with David A. Ray, D.O., as part of the disability application process. (Tr. 179). Culwell's complaints included intermittent back pain, shoulder problems, asthma, migraines, and allergies. She reported that her back pain began in 1996, and she also complained of pain and occasional numbness in her shoulders, which was worse with activity. Culwell used an inhaler two or three times a day for asthma. She reported that her migraines were not relieved by prescription medication, and allergy testing had shown her to be allergic to many things. Culwell required no assistance with personal hygiene or dressing herself. She was able to do light housework, cook meals, walk to the mailbox, drive herself, and go shopping. (Tr. 179).

On examination, Ray observed that Culwell could sit, stand and move about without assistance. He heard no abnormal sounds when he listened to her lungs. Her low back was tender to palpation with spasms, but Ray considered Culwell's demonstration of a reduced range of flexion to be "inappropriate." (Tr. 180). Culwell refused to squat or hop, explaining that it would cause back pain. Culwell's grip strength was strong with good finger dexterity. A lumbar spine x-ray showed degeneration at L5-S1 with spurring. X-rays of her left shoulder and right hip were normal. (Tr. 180-81).

Culwell was hospitalized for asthma and pleurisy on August 27, 2004. She was discharged

---

[1] The medical evidence in the administrative record is summarized as it relates to Culwell's impairments on or after her amended alleged onset date of May 3, 2004.

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 4**

on August 30, 2004, with instructions to follow-up at the health clinic. (Tr. 187-88).

Culwell saw her treating psychiatrist, Art Smith, M.D., at the Mental Health and Mental Retardation (MHMR) clinic on September 1, 2004. (Tr. 225-30). Her MHMR records reflect that she was being treated for major depression, recurrent, moderate, and she confirmed that she was taking Lexapro and Trazodone as prescribed. (Tr. 229). Despite recent respiratory problems, Culwell described her mood as good, with good energy, sleep, and appetite. She complained of being unable to work due to respiratory disease, back pain, and shoulder pain, and had no resources to pursue treatment. Culwell announced that she was getting married in October. Her affect was bright, and Smith assessed a good response to medication. (Tr. 229).

Culwell went to the Jack County health clinic on September 28, 2004, with complaints of a cough, congestion, sore throat, and itchy, watery eyes. She was diagnosed with asthmatic bronchitis and medication was prescribed. (Tr. 310). Three weeks later she returned with complaints of diarrhea, nausea, headaches, slurred speech, and diffuse soreness. She was given a prescription for Phenergan. (Tr. 308). A computed tomography (CT) scan of her head was unremarkable. (Tr. 309).

Culwell saw Smith for a quarterly follow-up visit on December 20, 2004. She reported a good mood and energy level, but complained of insomnia that was partially due to allergies. She also complained of significant pain, which she was treating with over-the-counter pain relievers. Her Lexapro prescription was refilled and her Trazodone dosage was increased to address her insomnia. (Tr. 343).

On December 29, 2004, Culwell went to the county health clinic with complaints of nasal

congestion, a runny nose, cough, and headaches. She was diagnosed with an upper respiratory tract infection and given medication. (Tr. 306). Culwell went to the emergency room on January 10, 2005, complaining of a migraine that began the previous evening and pain that radiated the length of her spine. (Tr. 347). Her cervical range of motion was decreased. She was given injections of Toradol and Phenergan to relieve her pain and nausea. (Tr. 348). During a follow-up visit the next day, she reported feeling better, but complained that her back hurt all of the time. She exhibited minimal tenderness along her spine. (Tr. 305).

Culwell attended an MHMR session with Smith on June 27, 2005. (Tr. 341). She reported being in a good mood. Her energy level was slightly low, which she attributed to the summer heat, asthma and allergy symptoms. She also had some neck pain, which was being treated by her family physician. She reported sleeping well since her medication was increased. No changes were made to her medications, but she was advised to take a multivitamin with iron. (Tr. 341).

Culwell went to the emergency room on September 12, 2005, complaining of chest pain radiating into her left arm, nausea, and a headache. (Tr. 345). No abnormal findings were noted on examination, and her diagnoses were listed as chest pain, anemia, and gastroesophageal reflux disease. She was advised to see a cardiologist and have a stress test performed. (Tr. 346).

Culwell was seen at MHMR on January 30, 2006. (Tr. 339). Her Lexapro had recently been discontinued due to side-effects. She was taking Wellbutrin and reported a good response to her medications. Her mental status examination was described as essentially normal. She stated that she was doing well and had been working out at an exercise facility. (Tr. 339).

    2.    Administrative Hearing

Culwell testified that she was born March 24, 1960. (Tr. 473). She most recently worked in 1995 operating an in-home daycare. (Tr. 474). She testified that she was no longer able to work because she could not go out in public because of asthma and migraines. She also testified that her depression prevented her from concentrating for more than short periods of time. (Tr. 474-75).

Culwell stayed home most of the time. She washed dishes and dusted the furniture, but also spent five or six hours a day watching television. She occasionally did her laundry at her apartment building's laundry room, which was located thirty or forty feet from her apartment. (Tr. 475-76). She was able to drive herself to the grocery store or the dollar store, and also drove to her MHMR appointments each month. (Tr. 476). Culwell testified that she used a nebulizer one to six times a day, but most often in the evenings. (Tr. 477). Her asthma was worse in public because she had panic attacks, and odors, colognes, and gases also aggravated her asthma. She used her nebulizer or went to the emergency room for her asthma attacks, but she had not needed to go to the emergency room in a while. (Tr. 478-79). She had not seen a pulmonologist recently because she did not have money or insurance to pay for the services. (Tr. 487).

Culwell testified that a good day for her meant that her depression was not as severe and levels of pollen and humidity were low. On her bad days, she would sit or lie down on her bed or couch. Physical activity caused shortness of breath and a choking sensation. (Tr. 480-81). She also experienced headaches two or three times a month that made her sensitive to light and noise and made her vomit. She used aspirin, ice packs, and sleep to alleviate her headaches, which could persist for one to three days. (Tr. 481).

Culwell testified that she had been treated for major depression since 2002. She saw a

counselor monthly and saw the psychiatrist on a quarterly basis to have her medications refilled. Her current medications included Wellbutrin XL for depression and trazodone to help her sleep, and she had adjusted well to both of these medication. (Tr. 482-83). She testified that being in public caused panic attacks that affected her breathing and made her shake, and she also experienced panic attacks at home if she had a visitor who was irritating her. (Tr. 483-84). Culwell testified that she was irritable and tended to isolate herself from others because she was afraid she would end up hurting someone, including her grandchildren. (Tr. 484). She experienced crying spells two or three times a week. Culwell admitted having suicidal thoughts, but had never attempted suicide. (Tr. 485). She also had difficulty remembering to complete projects she started, such as cooking or laundry. She limited her driving because of her attention span. (Tr. 485-86).

Vocational expert Todd Harden testified that Culwell's previous daycare job was considered semi-skilled work requiring medium exertion. (Tr. 488). She had worked as a telephone solicitor, which was a semi-skilled, sedentary job, and as a silk screen printer, a mailer, and a cashier-checker, which were semi-skilled jobs that required light exertion. She had also worked as a stock clerk for a cigarette company, which was a semi-skilled job requiring heavy exertion. (Tr. 488-89). The ALJ asked Harden to consider

> an individual of the same age, education and vocational history as the claimant. Further assume that this hypothetical individual would have the following limitations. Lifting and carrying occasionally 20 pounds, lift and carry frequently 10 pounds; stand and walk at least six hours in an eight hour day; sit about six hours in an eight hour day; no push-pull limitations; no climbing of ladders or scaffolds; frequent balancing, kneeling, crouching, crawling and stooping; no manipulative limitations; no communication limitations; no working in excessive heat; no working in excessive humidity; no working around excessive fumes, odors, dust, gasses or chemicals; would be able to understand, remember and carry out short, simple

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 8**

> instructions; can make judgments on simple work related decisions; with only occasional contact with the public and co-workers.

(Tr. 489-90). Harden testified that Culwell's previous work as a mailer and as a silk screen printer would meet the foregoing criteria depending on the level of dust and fumes, which varied from workplace to workplace. Harden also identified other unskilled jobs that would fit within the hypothetical, including electronics worker (with 30,000 jobs nationwide and 2,000 in Texas), bench assembler (with 75,000 jobs nationwide and 6,200 in Texas), or small products assembler (with 100,000 jobs nationwide and 8,000 in Texas). (Tr. 490). Culwell's attorney asked Harden about the vocational impact if a person missed work two or three days a month, required additional breaks to use a nebulizer, and had a production rate reduced by 25%. Harden indicated that it would eliminate all of the jobs he had identified. (Tr. 493).

      3.      Post-Hearing Medical Evidence

At the end of the administrative hearing, the ALJ advised Culwell that he would be sending her for additional testing and evaluation before he rendered his decision. As part of the ALJ's plan to further develop the record, Culwell was evaluated on September 12, 2006 by internist Gary T. Evans, M.D. (Tr. 437). Culwell reported having asthma since childhood, which caused chronic shortness of breath and wheezing. She complained of chronic neck pain and stiffness since a motorcycle accident in 1995 and neck surgery in 1997. She also had chronic shoulder pain and low back pain. Sitting and standing increased her pain and discomfort. (Tr. 437). A physical examination was unremarkable, although lumbar x-rays showed disc space narrowing. Evans diagnosed chronic asthma with intermittent exacerbations, lumbar disc syndrome with chronic pain,

cervical disc syndrome post surgery, and a reported major depressive disorder. (Tr. 438).

Evans completed a medical source statement and found Culwell capable of lifting ten pounds; standing or walking for at least two hours in an eight-hour workday; sitting less than six hours in an eight-hour workday; and limited pushing or pulling with her upper and lower extremities. (Tr. 441-42). Evans explained that Culwell had chronic neck and low back pain that was exacerbated by prolonged walking, lifting, or pulling, and he opined that her asthma might also limit her exercise capacity. Evans found that Culwell could occasionally climb, balance, kneel, crouch, crawl or stoop. He imposed no manipulative or communication limitations, but thought Culwell should avoid dust, humidity, fumes, odors, chemicals and gases due to her asthma. (Tr. 444). Culwell also had pulmonary function testing, which suggested the presence of an obstruction lung disease, but spirometry results were considered normal. (Tr. 445).

On September 15, 2006, Culwell underwent a consultative psychological evaluation with Douglas Krug, Ph.D., supervised by Bobbie Lilly, Ph.D. (Tr. 449). Culwell reported dropping out of school in the eighth grade to marry and have a child, but she later obtained a GED. She had been married four times and divorced three times, and described her first three marriages as abusive. She also had been molested by at least one family member. Culwell had four children, ages 30, 28, 25, and 17, and was distressed because her teenaged son had been murdered in July. Culwell had been on disability for her asthma, but her benefits ended in 2001. She explained that she was unable to keep a job because of migraines, back pain, asthma, depression, and multiple somatic complaints. She had a history of depression and anxiety that was being treated by MHMR staff. (Tr. 449-50).

On mental status examination, Culwell was cooperative, but Krug noted that she made poor

eye contact and appeared worried. (Tr. 450). Her motor activity, orientation, speech, and perceptions were unremarkable. Her mood was depressed and anxious, with a blunted affect. Her thought processes centered on the death of her son and she had a brief attention span for most other subjects. Krug opined that Culwell exhibited low self esteem, guilt, and self-hatred, and she was preoccupied with speculation that her family included multiple sexual predators. (Tr. 450-51). Culwell was able to recall statistics, such as her birthday and social security number, but had repressed most childhood memories. She demonstrated attention-related impairments that interfered with her memory, which Krug attributed to anxiety and post traumatic stress disorder. Culwell reported that she enjoyed reading and was active in her church. She spent time reading the Bible, cooking, and cleaning. (Tr. 451).

      Culwell was able to follow a three-step command, but during periods in which she ruminated on her son's murder or her traumatic history, she demonstrated poor task maintenance and was unable to concentrate unless redirected. Her pace was good when her attention was redirected, but poor when she was unable to focus. Culwell demonstrated a poor understanding of cause and effect, and she tended to make poor judgments. Culwell was able to follow logical thought, but was unable to generate a logical thread without tutoring. (Tr. 451). Testing further indicated that Culwell had a full scale IQ of 90, with most her scores in the low average range. (Tr. 451). Her scores were consistent with some type of learning impairment. She had sixth-grade arithmetic skills and read at an early high school level, but her spelling and grammar skills were equivalent to a third-grade level. (Tr. 452). Personality testing resulted in exaggerated scores that Krug interpreted as an outcry for help or the result of prolonged trauma. Culwell's symptoms were also consistent with

motivations of secondary gain. (Tr. 453). Krug's diagnostic impressions included post traumatic stress disorder, major depressive disorder, anxiety disorder, bereavement, a learning disorder, and an unspecified personality disorder. Krug assessed a current Global Assessment of Functioning (GAF) score of 38,[2] with a poor to guarded prognosis given Culwell's history of severe trauma and abuse. (Tr. 454).

Based on Krug's findings, Lilly completed a medical source statement of Culwell's ability to perform work-related mental activities. (Tr. 457-59). Culwell was found to have slight impairment[3] in her ability to understand, remember, and carry out short, simple instructions. Slight impairment was also noted in Culwell's ability to interact appropriately with the public, supervisors, and coworkers and to respond appropriately to work pressures in a usual work setting. She was considered moderately limited[4] in her ability to understand, remember, and carry out detailed instructions; make judgments on simple work-related decisions; or respond appropriately to changes in a routine work setting. Lilly found no other capabilities were affected by Culwell's impairments and opined that Culwell was capable of managing her benefits in her own best interest. (Tr. 457-58).

4.  ALJ Determination

---

[2] A GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994)(DSM-IV). A GAF score of 31-40 reflects some impairment in reality testing or communication (e.g., speech that is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *See id.* at 34.

[3] The medical source statement defined a slight impairment as one involving mild limitation in performing a given mental activity, but the individual could generally function well. (Tr. 457).

[4] The medical source statement defined a moderate impairment as one involving moderate limitation in performing an activity, but the individual was still able to function satisfactorily. (Tr. 457).

The ALJ found that Harden had not engaged in substantial gainful activity since her alleged onset date and that she had the following severe impairments: depressive disorder, asthma, and osteoarthritis. (Tr. 14). The ALJ found that Harden's impairments did not meet or medically equal any listed impairment. After consideration of the entire record, the ALJ decided that Harden had the residual functional capacity (RFC) to perform a limited range of light work that avoided extreme heat, humidity, or excessive fumes, odors, chemicals or gases and required no more than occasional interaction with the public or co-workers. The ALJ found Harden was unable to perform her past relevant work, but there was other work available in significant numbers in the national economy that Harden could perform, including electronics work, bench assembly, or small products assembly. (Tr. 18). Accordingly, the ALJ decided that Culwell was not disabled. (Tr. 19).

E.  DISCUSSION

Culwell contends that the ALJ's assessment of her physical and mental residual functional capacity (RFC) is not supported by substantial evidence and is a result of the ALJ's failure to comply with relevant legal standards in assessing her claim. More specifically, Culwell complains that the ALJ's determination is contrary to the medical opinions offered by consultative examiner Evans and consulting psychologists Krug and Lilly.

The ALJ must consider and weigh all medical opinions in the record, even opinions on issues reserved to the Commissioner, such as the RFC assessment. 20 C.F.R. § 416.927(b), (d), (e)(2). If the RFC assessment conflicts with a medical source opinion, the ALJ must explain why the opinion was not adopted. SOCIAL SECURITY RULING 96-8p. However, the determination of disability always remains the province of the ALJ, and the ALJ can decrease the weight assigned to any medical

opinion for good cause, which includes disregarding statements that are brief and conclusory, unsupported by acceptable diagnostic techniques, or otherwise unsupported by the evidence. *See Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994).

The ALJ summarized the reports of each of the consultative examiners. He acknowledged the significant restrictions that Evans imposed on Culwell's physical RFC, but assigned little weight to Evan's opinion because it was unsupported by findings on any functional assessment test and was inconsistent with Culwell's own testimony about her activities. (Tr. 17). Although Culwell relies on x-rays findings of a degenerative condition in her back, she does not dispute that Evans found few objective signs of impairment when he examined her. Culwell was previously examined by David Ray, who likewise found few positive signs of functional limitation.[5] The ALJ also relied on evidence that Culwell spent most of the day sitting and watching television (contrary to Evan's findings of a limited ability to sit) and also cooked, cleaned, and read during the day, which were all activities requiring attention, concentration and a fair amount of activity. Culwell also had not required emergency-room treatment for her asthma since 2004. (Tr. 17). The ALJ adequately explained the weight assigned to Evan's opinions, and substantial evidence supports his assessment that Culwell retained the physical capacity to perform a modified range of light work with environmental accommodations for her asthma.

With respect to Culwell's mental functioning, the ALJ found mild restrictions in her

---

[5] Culwell complains that Ray described the reduced range of motion in her spine as "inappropriate" without explaining that term. The ALJ interpreted this to mean that Ray did not believe Culwell, (Tr. 18), which is a reasonable understanding given Ray's observations of Culwell's normal gait, reflexes, and neurological status.

activities of daily living; moderate impairment in social functioning; mild impairment maintaining concentration, persistence or pace; and no documented episodes of decompensation. (Tr. 16). In assessing her RFC for basic work activities, the ALJ included only one non-exertional limitation restricting Culwell to occasional interaction with the public or coworkers.[6] Culwell complains that the ALJ did not explain why he omitted limitations to accommodate poor attention, concentration, judgment and decision-making skills identified in Krug's consultative examination report.

The ALJ did not specify the weight given to the opinions offered by the consulting psychologists, which is contrary to the relevant disability regulations and rulings; however, prejudice must result for this omission to warrant disturbing the Commissioner's determination. *See Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. Unit A 1981) (per curiam). The ALJ's decision illustrates that the ALJ was aware of his obligation to consider the medical opinions in the record. The ALJ reviewed the consulting psychologists' report and found that their opinions reflected slight to moderate mental impairment as outlined in the functional capacity assessment the psychologists had provided. (Tr. 16, 17). The ALJ also observed that Culwell's scores on the battery of psychological tests were consistent with symptom magnification and somatization, and he discounted Culwell's subjective complaints of panic attacks and serious impairment because she had not presented these symptoms during her routine visits at MHMR. (Tr. 17). The ALJ noted that reports from Culwell's MHMR visits showed an excellent response to treatment. She reported joining an exercise program, she remarried during the relevant time period, and she had no complaints except for insomnia. (Tr.

---

[6] Culwell also complains that the ALJ found her social functioning more limited than the consulting examiners did; however, this difference cannot be prejudicial as the only relevant effect of the ALJ's finding is a decrease in the number of relevant jobs in the national economy that Culwell could be expected to perform.

**Findings, Conclusions and Recommendation of the United States Magistrate Judge–Page 15**

15, 17). She testified that she would sit and watch movies for five or six hours a day and told Krug that her activities included cooking, cleaning, and reading. The ALJ also noted that the MHMR treating psychiatrist had described Culwell as calm and pleasant during her sessions and had documented a good mood, good memory, good energy, and good sleep habits. (Tr. 15).

The ALJ presented a hypothetical to the vocational expert that limited Culwell to short and simple work and judgments involving simple work-related decisions, then omitted these limitations from the formal RFC assessment in his written decision after considering Culwell's reported activities and treatment history. This assessment has the support of substantial evidence, particularly Culwell's progress reports with MHMR, even if the court might have reached a different conclusion on the same record. *See Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir.1980)(observing that reviewing court may not substitute its judgment for the Commissioner's even if the court determines the evidence preponderates toward a different finding).

Even if the ALJ should have included additional limitations in Culwell's attention, concentration, judgment and decision-making skills based on Lilly's assessment of moderate impairment in these areas, Culwell has not demonstrated how this omission has resulted in substantial prejudice. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988). The ALJ's determination at the fifth step of the sequential evaluation process that Culwell was not disabled was based on the unskilled jobs identified by the vocational expert, who incorporated restrictions to short, simple tasks and simple work-related decisions in his testimony.[7] Although Culwell asserts

---

[7] The ALJ did not submit a new hypothetical to the vocational expert after he received the consultative examiners' reports. The ALJ instead affirmed that the vocational expert had been questioned about work existing for an individual of claimant's age, education, work experience, and RFC when in fact the vocational expert had been given a more restricted hypothetical than would otherwise be required given the ALJ's later assessment of Culwell's

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 16**

that the vocational expert further testified that a 25% reduction in productivity would preclude competitive employment, there are no medical source opinions imposing such a limitation and Culwell identifies no other evidence to suggest that the ALJ should have found that she has a 25% reduction in her production rate.

The administrative record contains substantial evidence supporting the ALJ's determination that Culwell is not disabled as that term is defined and used in the Social Security Act, and any deficiencies in the ALJ's decision did not substantially prejudice the outcome.

## RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

## NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until August 8, 2008. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed

---

RFC.
**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 17**

factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

## ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until August 8, 2008 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED JULY 17, 2008.

    /s/   Charles Bleil
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE